## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Mar 26 2015, 8:57 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Bruce W. Graham
Graham Law Firm P.C.
Lafayette, Indiana

ATTORNEY FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Lyubov Gore
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Scotty Johnson,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff*

March 26, 2015

Court of Appeals Case No.
79A02-1408-CR-573

Appeal from the Tippecanoe
Superior Court
The Honorable Thomas H. Busch,
Judge
Cause No. 79D02-1304-FB-14

**Bailey, Judge.**

# Case Summary

[1] Scotty Lee Johnson ("Johnson") was convicted after a jury trial of Criminal Deviate Conduct, as a Class B felony,[1] and Sexual Battery, as a Class D felony;[2] he was also adjudicated as a Habitual Offender.[3] Johnson now challenges his convictions.

[2] We affirm.

# Facts and Procedural History

[3] On August 23, 2012, Johnson had gone to Columbian Park in Lafayette with his girlfriend, Cynthia, and Cynthia's daughter, "S." S. was dancing on a stage in the park while Johnson watched and recorded her with a video camera. Cynthia alternately watched S. and walked around the park near the stage.

[4] Around late afternoon, sixteen-year-old B.W. and her brothers, "C." and "J.J.," walked to Columbian Park from their home nearby, where they lived with their mother ("Mother") and her boyfriend ("Stepfather"). When the three children

---

[1] Ind. Code § 35-42-4-2(a) (West 2012). The Indiana General Assembly repealed this provision of the Indiana Code in 2013 and recodified the substantive provisions at issue in this case at I.C. § 35-42-4-8 (Ind. 2013), the sexual battery statute. In light of the revisions to Indiana's statutes, we apply the substantive provisions in effect at the time of Johnson's offense. *See* I.C. § 1-1-5.5-21(a) (providing that changes to the Indiana Code apply only to those offenses and proceedings commenced after the effective date of the revised statutes).

[2] I.C. § 35-42-4-8.

[3] I.C. § 35-50-2-8.

left for the park, B.W. brought a radio with her, and she was wearing a tank top and shorts.

[5]     B.W. and her brothers all had developmental disabilities. B.W. was identified as having a mild cognitive impairment, with an intelligence quotient ("IQ") of less than 70. One of her brothers was profoundly autistic and was nonverbal; the other brother had limited ability to speak in conversation with others. Mother and Stepfather generally allowed the children to go to the park unaccompanied because the family's home was six houses away from the park. Stepfather was accustomed to going to the park to check on the children on these occasions.

[6]     B.W. and her brothers arrived at the stage area. Her brothers sat or stood nearby, but B.W. brought her radio onstage and began dancing with S. Johnson continued recording, and at various points also got onstage and danced with B.W. and S. At one point, B.W.'s bra strap was slipping. Without request, Johnson adjusted it for her.

[7]     After about an hour, Johnson, Cynthia, and S. left the stage area to return home. B.W. needed to use the bathroom and walked to a separate building where men's and women's restrooms were located. C. and J.J. waited for her nearby.

[8]     At some point during their walk home, Johnson told Cynthia that he was going back to the park because B.W., C., and J.J. had asked him to "smoke weed" with them. Johnson then returned to the park, while Cynthia and S. stopped at

a gas station to get a drink, and then returned home. Johnson returned to the park on his bicycle carrying a backpack that had his video camera, a laptop computer, a pair of sweatpants belonging to Cynthia, and a black bra.

[9] Shortly after B.W. entered the farthest stall in the women's restroom, Johnson entered the restroom and approached B.W.'s stall. Johnson manipulated the lock to the stall, causing it to open, then stepped in and closed the stall door.

[10] After entering the stall, Johnson told B.W. to change out of her shorts and into the sweatpants he had been carrying in his backpack. B.W. complied; Johnson then put his hand in her pants and inserted his finger into B.W.'s vagina several times. B.W. asked him to stop, and Johnson said he would do so if she kissed him. B.W. did so, and Johnson stopped.

[11] Johnson then took the black bra from his backpack and told B.W. to change into the black bra. B.W. complied and took off her bra; while B.W.'s bra was off, Johnson kissed her right breast. B.W. then put on the black bra. Johnson exposed his penis and said that he wanted to have sex with B.W.; B.W. refused, telling Johnson that she had a boyfriend.

[12] At some point during these events, Stepfather arrived at the park to check on the children. He found J.J. and C. standing near the women's restroom building, still waiting for B.W. To hurry B.W. along, Stepfather opened the bathroom door and asked B.W. to come out soon. Johnson replied, saying that B.W. would be out shortly.

[13] Stepfather thought hearing a male voice was unusual, but remembered that sounds from the men's and women's restrooms echo between one another. He checked the men's restroom, but found no one there. By this point, J.J. and C. had begun to walk home on their own, and Stepfather had to catch up with them.

[14] Shortly after this, B.W. ran out of the women's restroom. Crying and distraught, she ran past Stepfather and her brothers. When B.W. arrived home, she was still shaking and crying. At the time, B.W. was still wearing the sweatpants and bra Johnson had given her, and was carrying her own bra; she had left the shorts she was wearing behind. B.W.'s mother immediately called police.

[15] After an investigation, police identified Johnson as the individual who was in the bathroom with B.W. On March 22, 2013 the State charged Johnson with Criminal Deviate Conduct; Criminal Confinement, as a Class D felony;[4] and Sexual Battery. On May 2, 2014, the State alleged that Johnson was a Habitual Offender.

[16] A jury trial was conducted on June 10 and June 11, 2014. At the end of the trial, the jury found Johnson guilty as charged of Criminal Deviate Conduct

---

[4] I.C. § 35-42-3-3.

and Sexual Battery, and found him not guilty of Criminal Confinement. After the jury's verdict, Johnson stipulated to his status as a Habitual Offender.

[17] A sentencing hearing was conducted on July 3, 2014. At the hearing's conclusion, the trial court entered judgments of conviction against Johnson for Criminal Deviate Conduct and Sexual Battery, and adjudicated Johnson to be a Habitual Offender. The trial court sentenced Johnson to fifteen years imprisonment for Criminal Deviate Conduct and two years imprisonment for Sexual Battery, with these terms running concurrently. The trial court also ordered Johnson's sentence for Criminal Deviate Conduct enhanced by twenty years imprisonment as a result of his status as a Habitual Offender. This yielded an aggregate term of imprisonment of thirty-five years.

[18] This appeal ensued.

# Discussion and Decision

[19] On appeal, Johnson challenges the sufficiency of the evidence underlying his convictions.

[20] Our standard of review in sufficiency cases is well settled. We consider only the probative evidence and reasonable inferences supporting the judgment. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). We do not assess the credibility of witnesses or reweigh evidence. *Id.* Because the jury is able to observe the demeanor of witnesses and ascertain their credibility, "[w]e will not invade the province of the jury and determine whom to believe." *Perry v. State*, 541 N.E.2d

913, 916 (Ind. 1989). We will affirm the conviction unless "no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Drane*, 867 N.E.2d at 146 (quoting *Jenkins v. State*, 726 N.E.2d 268, 270 (Ind. 2000)). There is sufficient evidence if an inference may reasonably be drawn from the evidence to support the judgment. *Id.* (quoting *Pickens v. State*, 751 N.E.2d 331, 334 (Ind. Ct. App. 2001)).

[21] Johnson was convicted of Criminal Deviate Conduct and Sexual Battery. To convict Johnson of Criminal Deviate Conduct, as charged, the State was required to prove beyond a reasonable doubt that Johnson knowingly or intentionally cased B.W. to perform or submit to Johnson's touching of her vagina, while B.W. was mentally disabled or deficient such that she could not give consent to the conduct. *See* I.C. § 35-42-4-2(a) (West 2012); App'x at 7. To convict Jonson of Sexual Battery, as charged, the State was required to prove beyond a reasonable doubt that Johnson, with intent to arouse or satisfy his sexual desires or those of B.W., touched B.W. while she was so mentally disabled or deficient that she could not give consent to the touching. I.C. § 35-42-4-8.

[22] On appeal, Johnson does not contend that he did not engage in sexual conduct with B.W. Rather, Johnson argues that the State failed to adduce sufficient evidence as to B.W.'s incapacity to give consent, and advances two arguments in this respect. First, Johnson contends that there was insufficient evidence to establish B.W.'s incapacity to consent. Second, Johnson argues that even if there was sufficient evidence of B.W.'s incapacity to consent, there nevertheless

was insufficient evidence that he knew or should reasonably have known that B.W. was mentally disabled or deficient such that she could not give consent. We address these arguments in turn.

## Capacity to Consent

[23] This Court has previously addressed cases regarding the sufficiency of the evidence as to incapacity to consent to sexual conduct due to mental disability or deficiency. Summarizing a number of these cases, this Court observed in *Ball v. State*:

> In a criminal deviate conduct case alleging mental disability or deficiency, this court held that "[t]he plain and ordinary meaning of the words 'mentally disabled or deficient' is subnormal intelligence or mental disease or defect." *Douglas v. State,* 484 N.E.2d 610, 613 (Ind. Ct. App. 1985). Noting the phrase "mental disability or deficiency" is qualified by the resultant inability to give consent, the meaning has been expanded for purposes of those statutes to include not only a victim with lower-than-normal intelligence, *see, e.g., Bozarth v. State,* 520 N.E.2d 460, 463 (Ind. Ct. App. 1988) (twenty-one year old victim was deaf, legally blind, and had a mental age of approximately ten years old and an I.Q. between fifty and seventy), *trans. denied,* but also a victim who was highly intoxicated, *Gale v. State,* 882 N.E.2d 808, 818 (Ind. Ct. App. 2008), and a victim who had unknowingly ingested eight Xanax, *Hancock v. State,* 758 N.E.2d 995, 1004 (Ind. Ct. App. 2001), *aff'd in relevant part,* 768 N.E.2d 880 (Ind. 2002). As noted in *Warrick v. State,* 538 N.E.2d 952, 955 (Ind. Ct. App. 1989), however, the "mental disability or deficiency" prong of the criminal deviate conduct statute "primarily exists to prevent abuse of persons in our society who, by reason of mental disability, are unable to protect themselves from sexual abuse." The *lack* of consent is not an element of the offense; it is the *inability* to give consent that is required to show mental disability or deficiency.

945 N.E.2d 252, 257 (Ind. Ct. App. 2011) (emphasis in original).

[24] In support of its case, the State introduced testimony from B.W., Mother, and Ann Jackson ("Jackson"), a special education teacher familiar with B.W. Jackson testified concerning B.W.'s cognitive and behavioral abilities, and provided documents concerning B.W.'s abilities in the form of B.W.'s individualized education plan ("IEP"). The IEP indicated that B.W.'s eligibility for special education services was the result of a cognitive disability. Specifically, the IEP indicated that B.W. had a mild mental disability, and "General Cognitive Ability on Differential Ability Scales placed her in the borderline to mild deficit range." (Ex. 16.) Johnson testified that students with a "mild" cognitive disability have IQs ranging between 50 and 70. (Tr. at 151.) This result was determined when B.W. was six years old, and Johnson testified that IQ scores do not tend to change significantly during an individual's lifetime. (Tr. at 154.)

[25] Mother also testified at the trial and stated that at the time of the trial, after B.W. had turned eighteen years old, B.W. was not able to be left alone overnight, could not cook for herself, and did not have a driver's license. Jackson agreed that it would be a "bad idea" for B.W. to drive a vehicle. (Tr. at 153.) And a witness called by Johnson, Tracy Bibler ("Bibler"), another of B.W.'s teachers, testified that B.W. was easily influenced and that her generally positive assessment of B.W.'s abilities was made in comparison to those of other special education students. (Tr. at 168, 170.) The jury also heard testimony from B.W., during which they were able to judge for themselves B.W.'s capabilities.

[26] In his brief, Johnson contends that while there was evidence that B.W. had intellectual deficits, the statute "does not say consent is invalid merely because the victim is naïve, inexperienced, immature, or easily influenced." (Appellant's Br. at 11.) Yet Indiana courts have held that the ordinary meaning of "mentally disabled or deficient" involves "subnormal intelligence or mental disease or defect," with an aim toward protecting vulnerable members of society who are unable to protect themselves from sexual abuse. *Ball*, 945 N.E.2d at 257 (quoting *Douglas*, 484 N.E.2d at 613). And Johnson's argument disregards B.W.'s testimony that she did not invite or verbally agree to Johnson's conduct and that she felt afraid during the encounter with Johnson in the bathroom, and that B.W. objected to Johnsons's request to engage in sexual intercourse by explaining that she had a boyfriend.

[27] There was evidence introduced at trial to establish B.W.'s intellectual deficits, and not merely that B.W. was naïve, inexperienced, or otherwise easily influenced. Accordingly, we cannot conclude that there was insufficient evidence from which a reasonable jury could conclude that B.W. was incapable of giving consent due to mental defect or disability.

## Knowledge of Capacity

[28] Johnson's other contention on appeal is that, given B.W.'s incapacity to consent, nevertheless Johnson did not know B.W. was sufficiently mentally disabled or deficient as to be unable to give consent.

[29] As to Johnson's conviction for Sexual Battery, as charged, we note that neither the charging statute nor the charging information require the State to prove any knowledge on the part of a defendant. Rather, the intent element is expressed with respect to the defendant's purpose in arousing or satisfying sexual desires where such touching is not consented to or cannot be consented to; it is not, as in the Deviate Sexual Conduct statute, required for each element of the offense. *See* I.C. § 35-42-4-8(a)(1). Having already concluded that there was sufficient evidence of B.W.'s incapacity to consent, we accordingly leave Johnson's Sexual Battery conviction undisturbed without need for further analysis.

[30] We turn now to Johnson's conviction for Criminal Deviate Conduct. The charging statute for Criminal Deviate Conduct requires that the State prove knowledge or intent as to each element of the offense. *See* I.C. § 35-42-4-2(a) (West 2012); *Gale v. State*, 882 N.E.2d 808, 816 (Ind. Ct. App. 2008) (concluding that, under the similarly-worded Rape statute, the defendant "had to be aware of a high probability that [the victim] was unaware that sexual intercourse was occurring"). Here, Johnson contends that there was insufficient evidence adduced at trial that he knew of a high probability that B.W. could not consent to sexual activity with him due to her mental disability or deficiency.

[31] Evidence supporting the judgment on this matter was presented by the State in the form of an audio recording of a conversation between Johnson and Cynthia during the police investigation, a video recording of B.W. dancing with S. on the stage at Columbian Park, and B.W.'s testimony at trial.

[32] Cynthia testified at the trial concerning the events of August 23, 2012. She also participated with a police investigation, and used a digital recorder provided by police to record a conversation with Johnson during which the two discussed the events associated with this case. In the recording of this conversation, which recording was admitted into evidence at trial, Johnson agreed with Cynthia that in retrospect it seemed to him that B.W., J.J., and C. were "not all there." (Ex. 14.) Cynthia, who unlike Johnson was not present at the stage area for the entire time B.W. was onstage, responded that B.W.'s mental state was obvious to her as soon as B.W. got on the stage with S. and began dancing. (Ex. 14.) And camera recordings from the stage make it clear that B.W. continued dancing with S. for nearly an hour, affording Johnson ample opportunity to observe B.W. (Ex. 18.)

[33] Further, as noted above, the jury had the opportunity to hear B.W.'s testimony and to assess her demeanor at trial. This would have included an opportunity for the jurors to assess B.W.'s cognitive abilities during both direct and cross examination. *See Perry*, 541 N.E.2d at 916 (recognizing as within the province of the jury assessment of a witness's demeanor). And, as we noted before, the evidence is not at all clear that B.W. considered any of her interaction with Johnson in the bathroom at Columbian Park to have been consensual.

[34] Based upon the recordings of Cynthia's conversation with Johnson and of B.W. dancing with S., together with the jury's opportunity to see B.W. for themselves, we cannot conclude that there was insufficient evidence from which a reasonable finder of fact could conclude that Johnson knew of a high

probability that B.W. was not competent to consent to sexual touching. We accordingly affirm Johnson's convictions.

# Conclusion

There was sufficient evidence adduced at trial both of B.W.'s incapacity to consent to sexual conduct and of Johnson's knowledge of a reasonable probability that B.W. was not competent to consent. We accordingly affirm Johnson's convictions.

Affirmed.

Robb, J., and Brown, J., concur.